[No. 59992-1.   En Banc.   November 18, 1993.]

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL ROSS HANSEN, *Petitioner*.

*Hanson & Dionne* and *Gregory M. Miller* (appointed counsel for appeal), for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Theresa Fricke* and *Jeffrey Baird, Senior Prosecuting Attorneys,* for respondent.

GUY, J. — Petitioner Michael Ross Hansen seeks review of a Court of Appeals decision affirming his conviction for the crime of intimidating a judge.

## BACKGROUND

In January 1988, Michael Hansen was convicted of a felony and was sentenced to 24 months in prison by King County Superior Court Judge Robert Dixon. Several months after his release from prison, Hansen began contacting attorneys in order to bring a civil action against the State, Judge Dixon, and Hansen's defense attorney and the prosecutor from the earlier trial.

On March 6, 1990, Hansen telephoned Chris Youtz, an attorney whose name he had obtained from the Seattle-King County Bar Association Lawyer Referral Service, with the stated desire that Youtz would take his case. Hansen explained to Youtz that he felt he had been conspired against, calling the trial a "kangaroo court". During this discussion, Hansen identified by name the prosecutor and public defender, but did not name the judge. Youtz explained to Hansen that he would not take the case and that Hansen might want to seek another attorney with more experience in criminal law. At this point in the conversation, Hansen became upset. Hansen explained that Youtz was the third lawyer he had talked to about the possible action, and he stated that the bar was not helping out with his cause. Hansen then stated:

> When you say I am not going to get any help from the Bar, I am not going to get any help from anybody . . . What am I

going to do . . . I am going to get a gun and blow them all away, the prosecutor, the judge and the public defender.

Report of Proceedings, at 62. Youtz continued to talk to Hansen and finally explained to Hansen that there was nothing else he could do for him.

Youtz, concerned about the "serious threat" that Hansen had made, consulted with a Washington State Bar Association representative and his law partner as to whether it was proper to disclose what Hansen had communicated to him. In order to determine the name of the threatened judge, Youtz contacted the named prosecutor and described his conversation with Hansen. The prosecutor informed Youtz that it was Judge Dixon who had heard the case. Upon learning the judge's identity, Youtz telephoned Judge Dixon and discussed with him what had taken place. Youtz testified during the trial that he "was convinced that some action very well could be taken against these individuals, the prosecutor, the judge and the public defender, and that I was — it was that concern that helped me call them and warn them." Report of Proceedings, at 84.

The Seattle Police Department conducted an investigation and subsequently arrested Hansen and charged him with the crime of intimidating a judge under RCW 9A.72.160. Hansen was convicted of intimidation of a judge and was sentenced to 24 months in prison. Hansen appealed this conviction, contending the trial court erred in its application of RCW 9A.72.160.

The Court of Appeals affirmed the trial court's conviction. *State v. Hansen*, 67 Wn. App. 511, 837 P.2d 651 (1992). In affirming the trial court's conviction, the Court of Appeals interpreted RCW 9A.72.160 to mean that an individual who threatens a judge does so with the intention or knowledge that the threat will reach the judge. *Hansen*, 67 Wn. App. at 516. The court found that there was sufficient evidence that Hansen had this intent when he made the threat. *Hansen*, 67 Wn. App. at 516. The Court of Appeals also held that the attorney-client privilege did not apply. *Hansen*, 67 Wn. App.

at 517. We granted Hansen's petition for review and affirm his conviction.

At issue in this case is the interpretation of RCW 9A.72-.160(1). RCW 9A.72.160 provides that:

> (1) A person is guilty of intimidating a judge if a person *directs a threat to a judge because of a ruling or decision of the judge in any official proceeding,* or if by use of a threat directed to a judge, a person attempts to influence a ruling or decision of the judge in any official proceeding.
> (2) "Threat" as used in this section means:
> (a) To communicate, directly or indirectly, the intent immediately to use force against any person who is present at the time; or
> (b) Threats as defined in RCW 9A.04.110(25).
> (3) Intimidating a judge is a class B felony.

(Italics ours.)

In its interpretation of RCW 9A.72.160, the Court of Appeals focused on the language "directs a threat to a judge" from subsection (1) of RCW 9A.72.160. *Hansen,* 67 Wn. App. at 515. The court noted that a definition of "directs" was absent from the statute. Using the definition of "direct[s]" from *Webster's Third New International Dictionary* 640 (1969), the Court of Appeals concluded that the word "directs" in RCW 9A.72.160 means that a "threat must be made with the intention or knowledge that it will reach the 'particular destination or object in view', *i.e.,* the judge." *Hansen,* 67 Wn. App. at 516. The court stated that "[a]ny other interpretation would contradict the common understanding of 'directs' and would not promote the statute's purpose of punishing those who seek to intimidate a judicial officer." *Hansen,* 67 Wn. App. at 516.

Hansen contends the Court of Appeals properly interpreted RCW 9A.72.160(1), but that the facts did not support his conviction. The State argues that the Court of Appeals' interpretation of RCW 9A.72.160(1) is incorrect insofar as it includes the additional mens rea element that the defendant intend or know the threat will actually reach the judge. We agree with the State that the Court of Appeals incorrectly interpreted RCW 9A.72.160.

██ "This court has the ultimate authority to determine the meaning and purpose of a statute." *State v. Elgin*, 118 Wn.2d 551, 555, 825 P.2d 314 (1992). Our function in interpreting a statute is to discover and give effect to the intent of the Legislature. *Stewart Carpet Serv., Inc. v. Contractors Bonding & Ins. Co.*, 105 Wn.2d 353, 358, 715 P.2d 115 (1986). To fulfill the Legislature's intent, statutes must be construed as a whole, and undue emphasis must not be placed on individual sections of a statute. *Finley v. Finley*, 43 Wn.2d 755, 761, 264 P.2d 246, 42 A.L.R.2d 1379 (1953). "To determine the intent of the Legislature, the court 'must look first to the language of the statute.' " *Service Employees Int'l Union, Local 6 v. Superintendent of Pub. Instruction*, 104 Wn.2d 344, 348, 705 P.2d 776 (1985) (quoting *Condit v. Lewis Refrigeration Co.*, 101 Wn.2d 106, 110, 676 P.2d 466 (1984)).

In interpreting RCW 9A.72.160(1), we must determine if the Legislature intended the statute require that a threat must be made with the intent or knowledge that it will reach the judge. We hold that RCW 9A.72.160 does not include such a requirement.

██ We determine that the legislative intent behind RCW 9A.72.160(1) is to protect judges from the threat of harm due by retaliatory acts because of past official actions by a judge.[1] Under the Court of Appeals' interpretation, the scope of RCW 9A.72.160 would not encompass true threats[2] to harm a judge that are made without an intent or knowledge that such threats would reach the threatened judge. This result is contrary to the Legislature's intent to protect judges from

---

[1] A similar purpose was found behind the statute protecting federal judges and their families in *United States v. Berki*, 936 F.2d 529 (11th Cir. 1991), *cert. denied*, 118 L. Ed. 2d 395 (1992). That court, in applying 18 U.S.C. § 115(a)-(1)(B), which makes criminal threats to harm a federal judge, stated that section 115(a)(1)(B) "was not enacted to prevent obstructions of justice, but solely to 'give [sufficient] protection to the [judges] enforcing an unpopular law.' " *Berki*, 936 F.2d at 532 (quoting *United States v. Feola*, 420 U.S. 671, 684, 43 L. Ed. 2d 541, 95 S. Ct. 1255 (1975)).

[2] A true threat "is a serious one, not uttered in jest, idle talk, or political argument." *United States v. Howell*, 719 F.2d 1258, 1260 (5th Cir. 1983), *cert. denied*, 467 U.S. 1228 (1984).

retaliatory acts. Such a result also negates the effect of the language from subsection (2) of RCW 9A.72.160.

Subsection (2)(a) of RCW 9A.72.160 includes a definition of the word "threat" and subsection (2)(b) incorporates a more expanded definition of threat from RCW 9A.04.110(25) into RCW 9A.72.160. A threat can thus be defined as a communication made *directly or indirectly* with the intent immediately to use force against any person or to cause bodily injury in the future to the threatened person or any other person. RCW 9A.72.160(2)(a); RCW 9A.04.110(25)(a). This language evidences a clear intent by the Legislature that RCW 9A.72.160 include threats communicated in an indirect fashion as well as direct threats. To carry out this legislative intent and realize the proper interpretation of RCW 9A.72.160, the statute must be construed as a whole by incorporating the definition of threat into subsection (1) of the statute. Under this interpretation, whoever threatens a judge, either directly or indirectly, *e.g.*, through a third person, because of an official ruling or decision by that particular judge, is chargeable under RCW 9A.72.160. The threat may ultimately find its way to the judge, but that is irrelevant with regards to the commission of the crime.

### SUFFICIENCY OF THE EVIDENCE

Hansen contends there was insufficient evidence to find a violation under RCW 9A.72.160. Hansen bases this contention on the premise that there was no evidence presented at trial which established Hansen intended or knew his threat would reach the judge.

A challenge to the sufficiency of evidence requires the reviewing court to consider the evidence in the light most favorable to the State, and the court must reject the challenge if a rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 220-21, 616 P.2d 628 (1980). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Spruell*, 57 Wn. App. 383, 385, 788 P.2d 21 (1990).

Because we conclude RCW 9A.72.160(1) does not require that the defendant's threat must be made with the intent or knowledge that the threat reach the judge, no evidence is required to prove such intent. Therefore, the elements required to be proven under RCW 9A.72.160(1) are: (1) that a person directs a threat, either directly or indirectly; (2) to a judge; and (3) because of a ruling or decision by that judge in any official proceeding.

In the present case, the record supports the trial court's finding that these elements were present. The elements are established by Hansen's statement to Youtz that he was going to "get a gun and blow [the judge] away." This satisfies both the first element, as it was a threatening statement made indirectly, *i.e.*, to a third party, and the second element, since the judge was one of the objects of the threat. The third element is proven by the fact that Hansen made the threat because of Judge Dixon's earlier official action when Hansen was convicted of a felony. Viewing the evidence most favorably to the prosecution, a rational trier of fact could find all the elements of RCW 9A.72.160(1) beyond a reasonable doubt. Therefore, we conclude there was sufficient evidence introduced at trial to prove that Hansen was guilty of intimidating a judge under RCW 9A.72.160.

## ATTORNEY-CLIENT PRIVILEGE

Hansen next argues that he should not be subject to culpability due to his reasonable belief that he was engaged in a confidential and privileged conversation when he made the threat. Hansen asserts there was no evidence presented of Youtz telling him that the conversation between Youtz and himself was not privileged or confidential.

The Court of Appeals concluded that the attorney-client privilege could not be claimed in this case. The court's basis for this conclusion was that the attorney-client privilege cannot be claimed after an attorney refuses to represent an individual since no attorney-client relationship was in existence. *Hansen*, 67 Wn. App. at 517. The Court of Appeals also stated that even if an attorney-client relationship had

720

existed, no privilege would apply to the communication in question since it involved the commission of a crime. *Hansen*, 67 Wn. App. at 517-18. The court reasoned that Hansen's threat was serious enough "to justify discarding the [attorney-client] privilege in order to protect Hansen's potential victims." *Hansen*, 67 Wn. App. at 518.

■ We agree with the Court of Appeals in both regards. An attorney-client relationship is deemed to exist if the conduct between an individual and an attorney is such that the individual subjectively believes such a relationship exists. *In re McGlothlen*, 99 Wn.2d 515, 522, 663 P.2d 1330 (1983). However, the belief of the client will control only if it "is reasonably formed based on the attending circumstances, including the attorney's words or actions." *Bohn v. Cody*, 119 Wn.2d 357, 363, 832 P.2d 71 (1992).

In this case, the "attending circumstances" cannot form the basis for a subjective belief that an attorney-client relationship existed. Hansen's total contact with Youtz consisted of one phone call. The conversation consisted of Hansen expressing a desire to bring certain individuals to trial, to which Youtz explained that he would not take Hansen's case and that Hansen might be better off finding another attorney. There was no evidence which could have led Hansen to believe that an attorney-client relationship existed. Arguendo, even if an attorney-client relationship had existed, it would have ended when Youtz explained to Hansen that he should seek another attorney. Therefore, on the record before us, there are not sufficient grounds to find that an attorney-client relationship existed.

■ If an attorney-client relationship could have been found to exist when Hansen made the threat against the judge, the prosecutor, and the public defender, the privilege would still not apply. The attorney-client privilege is not applicable to a client's remarks concerning the furtherance of a crime, fraud, or to conversations regarding the contemplation of a future crime. *State v. Richards*, 97 Wash. 587, 167 P. 47 (1917); *State v. Metcalf*, 14 Wn. App. 232, 540 P.2d 459 (1975), *review denied*, 87 Wn.2d 1009 (1976). Hansen's statement that he was going to blow away the judge, prosecutor and public de-

fender falls under this exception to the attorney-client privilege.

Under the Rules of Professional Conduct, an attorney is permitted to reveal information concerning a client's intent to commit a crime. "A lawyer may reveal . . . confidences or secrets to the extent the lawyer reasonably believes necessary . . . [t]o prevent the client from committing a crime". RPC 1.6(b)(1).[3]

■ To decide this case, we must determine whether an attorney has an affirmative duty to warn judges of true threats made by his or her client or by third parties. Whether a threat is a true or real threat is based on whether the attorney has a reasonable belief that the threat is real. We hold that attorneys, as officers of the court, have a duty to warn of true threats to harm members of the judiciary communicated to them by clients or by third parties.

We recognize the Court of Appeals in *Hawkins v. King Cy.*, 24 Wn. App. 338, 602 P.2d 361 (1979) declined to find a common law duty on the part of an attorney to warn of a client's intent to inflict serious injury on a third person. *Hawkins* is distinguishable from the present case. In *Hawkins*, the threatened third party had notice of the potential danger. 24 Wn. App. at 345. In the present case, Hansen threatened a judge who was unaware of the possible danger. We conclude that attorneys, as officers of the court, have a duty to warn of true threats to harm a judge made by a client or a third party when the attorney has a reasonable belief that such threats are real. Youtz followed this duty by warning Judge Dixon of Hansen's threat.

COURT OF APPEALS' PARAPHRASE
OF RCW 9A.72.160

Finally, Hansen argues that the Court of Appeals impermissibly broadened the scope of RCW 9A.72.160 in footnote 3 of its opinion. The Court of Appeals there stated:

---

[3] *See also* Model Rules of Professional Conduct 1.6(b)(1): "A lawyer may reveal such information to the extent the lawyer reasonably believes necessary . . . to prevent the client from committing a criminal act that the lawyer believes is likely to result in imminent death or substantial bodily harm . . .".

Clearly, Hansen's threat was motivated by his belief that, "in discharging his official role as a judge", Judge Dixon was a participant in the wrong inflicted upon him.

*Hansen,* 67 Wn. App. at 516 n.3.

Hansen contends that the "discharging his official role as a judge" language has the effect of expanding RCW 9A.72-.160 beyond its allowed scope.

The majority of case law pertaining to the paraphrasing of statutes applies to the paraphrasing of statutory language in jury instructions. *See State v. Faucett,* 22 Wn. App. 869, 593 P.2d 559 (1979); *State v. Toliver,* 6 Wn. App. 531, 494 P.2d 514 (1972). A jury instruction containing a paraphrased statute is sufficient if the instruction, when construed as a whole, correctly states the law. *Faucett,* 22 Wn. App. at 872.

We conclude the Court of Appeals correctly stated the law since the language "discharging his official role as a judge" similarly reflects the "ruling or decision of the judge in any official proceeding" element from RCW 9A.72.160(1). Therefore, footnote 3 of the Court of Appeals' opinion does not broaden or make impermissibly vague RCW 9A.72.160.

CONCLUSION

We reject the Court of Appeals' interpretation of RCW 9A.72.160 which requires the State to prove a defendant knew or intended his threat to reach a judge and hold that the proper interpretation of RCW 9A.72.160(1) is that whoever threatens a judge, either directly or indirectly, because of an official ruling or decision by that judge may be charged with intimidation of a judge. We affirm Hansen's conviction.

BRACHTENBACH, DOLLIVER, DURHAM, and SMITH, JJ., concur.

ANDERSEN, C.J. (concurring in part, dissenting in part) — I concur in part I of the dissenting opinion. However, like the Court of Appeals, I conclude that the evidence admitted at trial was sufficient for the trier of fact to determine, as it

did, that the defendant intended or knew his threat would be communicated to Judge Dixon; for this reason, I concur with the majority's affirmance of the conviction.

UTTER, J. (dissenting) — Independent judicial decision-making is one of the cornerstones of a society based on the rule of law. In order to preserve the ability of judges to make independent decisions, the Legislature has enacted a statute criminalizing the act of influencing judicial decisionmaking through, *inter alia*, threats of physical violence. Today, this court broadly interprets that criminal statute to apply to words and statements which have absolutely no possibility of influencing or intimidating judges. In doing so, it affirms the conviction of an individual who had neither the intention that his spontaneous expressions of frustration reach the ear of any judge, nor any reason to believe that they would. Because I believe this result is unfaithful both to the language and intent of RCW 9A.72.160, I respectfully dissent.

I

In affirming Hansen's conviction, the majority concludes that the language of RCW 9A.72.160 criminalizes threats even where the person making the "threat" has no intent or knowledge that his or her words will be communicated to a judge. In relevant part, the statute provides:

> (1) A person is guilty of intimidating a judge if a person directs a threat to a judge because of a ruling or decision of the judge in any official proceeding, or if by use of a threat directed to a judge, a person attempts to influence a ruling or decision of the judge in any official proceeding.
> (2) "Threat" as used in this section means:
> (a) To communicate, directly or indirectly, the intent immediately to use force against any person who is present at the time; or
> (b) Threats as defined in RCW 9A.04.110(25).

RCW 9A.72.160. RCW 9A.04.110(25) states: " 'Threat' means to communicate, directly or indirectly the intent: (a) To cause bodily injury in the future to the person threatened or to any other person . . .".

The Court of Appeals concluded the statute was not violated where a defendant had neither intent nor knowledge that his statements would be transmitted or communicated to a judge because the statute applies only to threats directed to a judge. *State v. Hansen*, 67 Wn. App. 511, 516, 837 P.2d 651 (1992).[4] The majority rejects this conclusion on the grounds that the statute "evidences a clear intent by the Legislature that RCW 9A.72.160 include threats communicated in an indirect fashion as well as direct threats." Majority, at 718. To read the statute otherwise, the majority argues, would be to negate the definition of threat in subsection (2). Majority, at 718. This approach to the statute is a familiar one: the majority is purporting to apply the traditional rule of statutory construction that all statutory language be given effect where possible. *See Cossel v. Skagit Cy.*, 119 Wn.2d 434, 437, 834 P.2d 609 (1992). The majority apparently reasons that if the Court of Appeals' construction renders some portion of the statute nugatory, it must be incorrect. A more careful reading of the statute reveals that not only is an intent or knowledge requirement compatible with the statutory language, it is more consistent with that language than is the majority's interpretation.

Under either prong of subsection (1), a defendant is guilty of intimidating a judge only when he or she "directs a threat to a judge". Standing alone, this language strongly implies that the defendant must intend or be aware that the threat will be communicated to, *i.e.*, "direct[ed] . . . to" the judge in some fashion. The majority finds this language to be modified, however, by the provision in subsection (2) which allows that threats may be communicated either directly or indirectly. In making this argument, the majority has confused the statute's treatment of the *manner* in which a threat is communicated to a judge with the issue of whether the threat is *intended to be communicated* to the judge at all.

---

[4]One member of the panel at Division One dissented. The dissent, however, disagreed only with the application of the statute. The entire panel was therefore in accord as to the proper construction of the statute.

Subsection (2) recognizes that a threat which is transmitted through a third party or an inanimate agency is communicated by the defendant to the judge just as effectively as one which is communicated directly. For example, telling a judge's spouse of one's intention to do harm to the judge, or leaving ominous messages on the judge's answering machine may qualify as communicated threats, even though not communicated directly. Allowing for this simple fact of modern communication is not tantamount to a legislative declaration that statements which are not themselves communications to the judge are punishable as intimidating a judge. In other words, the fact that a defendant may be punished for utilizing either direct or indirect means of communication does not compel the conclusion, as the majority argues, that a defendant may be punished for acts or words which are not communications to the judge at all.

This interpretation of the statute gives full effect to all of the language of the statute. Punishable threats may be made either directly or indirectly, as defined in subsection (2), but whether made directly or indirectly, they must be "direct[ed] . . . to a judge", as required by subsection (1). In fact, by giving effect both to the "direct[ed] . . . to a judge" language of subsection (1) *and* the "directly or indirectly" language of subsection (2), this interpretation is actually truer to the rule against superfluous language than is the majority's interpretation, which essentially reads the "direct[ed] . . . to a judge" language out of the statute entirely. The language of RCW 9A.72.160 therefore does not contradict the interpretation adopted by the Court of Appeals, but supports it under our rule against reading statutes to contain inoperative language.

I suspect, however, that the majority's interpretation of RCW 9A.72.160 is driven less by the statutory language than by the majority's concerns about the purposes which the statute is designed to serve. This is a statute whose interpretation is subservient to what purpose it is conceived to serve. If the purpose of the statute is, as the majority

argues, to protect the persons of judges from retaliation, it is irrelevant as to whether the judge is informed of the intent to retaliate. When the State becomes apprised of an intent to retaliate, by whatever means, the defendant is punished in order to deter the retaliation. A different result obtains if, as Hansen argues and the Court of Appeals agreed, the purpose of the statute is to deter the intimidation of judges in order to preserve judicial independence and the smooth operation of the justice system. If RCW 9A.72.160 is an anti-intimidation statute, then the defendant's intent or knowledge regarding potential communication of the threat to the judge is critical because statements which are not intended to reach their object have little or no capacity to intimidate.

Unfortunately, RCW 9A.72.160 does not contain a statement of purpose. To remedy this lack, the majority pronounces without analysis that the purpose of the statute is "to protect judges from the threat of harm due by retaliatory acts because of past official actions by a judge." (Footnote omitted.) Majority, at 717. The majority reads RCW 9A.72-.160 to be a sort of "impermissible motives" statute, whereby defendants are punished solely for expressing the impermissible motive of retaliation rather than for the effect which their action may have.

The language, legislative history, and statutory context of RCW 9A.72.160 belie the majority's intuitions about the purpose of the statute. While the evidence of legislative intent is relatively scant, all of the evidence which is available points to the conclusion that RCW 9A.72.160 was intended as an anti-intimidation measure and not as a special protective device for the persons of judges. Most importantly, the crime which RCW 9A.72.160 defines is not "retaliating against a judge" or "threatening to retaliate against a judge", it is "*intimidating* a judge". Under the majority's interpretation of RCW 9A.72.160, it would be possible to be convicted of "intimidating a judge" even if the judge *never* became aware of the supposed threat. A person could make a statement to no one at all, with no intent that the statement be transmit-

ted to a judge or even heard by a third party, and yet be convicted of intimidating a judge if a third party happened to overhear the statement. It is impossible to understand how such acts could be construed as constituting the crime of "intimidating a judge". The characterization of the very crime which Hansen is accused of committing thus supports his contention that the purpose of the statute is to eliminate certain pernicious effects on the legal process and not merely to punish certain unworthy motivations.

Hansen's argument is also supported by RCW 9A.72.160's legislative history and its statutory context. The title of the bill which became RCW 9A.72.160 was "AN ACT Relating to interference with judicial proceedings . . .". *See* Laws of 1985, ch. 327, § 1. The statutory context into which the new law was placed was RCW 9A.72, "Perjury and Interference With Official Proceedings". This suggests that it was not the person of the judge which was of concern to the Legislature in enacting RCW 9A.72.160, but rather the evil which could result from the use of threats to influence and corrupt judicial proceedings. In sum, all the evidence available regarding the purpose of RCW 9A.72.160 points to construing that statute as an anti-intimidation measure.

This is not to suggest that judges should not be protected in the performance of their official duties or that we should not be concerned about possible retaliation against judges; instead, understanding the statute in this fashion recognizes that threats against judges are only of *special* concern when those threats endanger the operation of our system of justice. When possible violence against judges creates no such danger, our concern about judges should extend no further than the ordinary protections of the criminal law. If an individual commits a criminal act against a judge, for whatever reason, that individual should be prosecuted in the same fashion as any other criminal defendant. Unless we believe that the ordinary organs of criminal law enforcement are incapable of protecting judges from random or spontane-

ous violence, there is no rationale for extending special protection to the persons of judges.[5]

It is for this reason that the federal case law on which the majority relies is inapposite. 18 U.S.C. § 115, at issue in *United States v. Berki*, 936 F.2d 529 (11th Cir. 1991), *cert. denied*, 118 L. Ed. 2d 395 (1992), and 18 U.S.C. § 111, at issue in *United States v. Feola*, 420 U.S. 671, 43 L. Ed. 2d 541, 95 S. Ct. 1255 (1975), are specifically designed to be "protected persons" statutes. As explained by the Supreme Court in *Feola*, their purpose is to provide protection for federal officials in the performance of their duties, *regardless* of the possible impact that violence against those officials may have on their performance. 420 U.S. at 678-80. The Court reasoned:

> In the congressional mind, . . . certainty required that these cases be tried in the federal courts, for no matter how 'respectable and well disposed,' it would not be unreasonable to suppose that state officials would not always or necessarily share congressional feelings of urgency as to the necessity of prompt and vigorous prosecutions of those who violate the safety of the federal officer.

420 U.S. at 684. That is, the federal statutes provide an additional layer of protection for federal officials above and beyond the ordinary protections of the (state) criminal law due to congressional concern that state government may not adequately prosecute those who harm federal officials. This fear is, of course, completely lacking here. Whatever the validity of the Court's concerns regarding state enforcement of the criminal law to protect federal officials, there can be no such concern with respect to state enforcement of the criminal law to protect *state* officials. Thus, the rationale

---

[5]It is of course true that punishing defendants for *any* threats against a judge, even when not communicated to the judge, may have a marginal effect on judicial autonomy and decisionmaking. The knowledge that any person anywhere who voices the motive of retaliation will be criminally liable may allow judges a scintilla of additional peace in making difficult or unpleasant rulings. In the absence of clearer legislative intent, however, indeed in the face of evidence which points only in the opposite direction, we should not construe the statute on the basis of this limited and marginal impact.

supporting the broad construction given to the federal statutes is inapplicable to RCW 9A.72.160.

We should therefore interpret RCW 9A.72.160 as requiring proof that a defendant intended or was aware that his or her statements against a particular judge would in fact be communicated to that judge. The limited evidence available to this court as to legislative intent points only to the conclusion that the purpose which motivated the Legislature in enacting the statute was to ensure the efficient operation of the justice system by deterring the intimidation of judges. Given this purpose, it would be irrational to extend the applicability of RCW 9A.72.160 to statements which defendants do not intend to be transmitted to judges or are reasonably unaware will be. Such statements pose little or no risk of disrupting the legal process since people, including judges, are simply not intimidated by threats of which they have no knowledge.

## II

Under this interpretation of the statute, the evidence before the trial court was insufficient to support Michael Hansen's conviction. "In reviewing the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Joy*, 121 Wn.2d 333, 338, 851 P.2d 654 (1993); *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

There was insufficient evidence to show that Hansen intended or knew his words would be communicated to the judge. The prosecution's case rested entirely on Hansen's single reference to blowing away the prosecutor, the judge, and the public defender during the conversation with attorney Youtz. Whatever threatening import can be attached to this isolated remark, there is nothing in it or in the surrounding circumstances which suggests Hansen wished or could have foreseen that Youtz would transmit the statement to Judge Dixon. Indeed, the circumstances surrounding Han-

sen's statement support only the opposite conclusion, that Hansen did *not* intend or reasonably foresee that his statements would be later communicated to Judge Dixon.

First, Hansen was at the time of the statement engaged in an attempt to obtain Youtz's services as an attorney. While the relationship necessary to trigger the attorney-client privilege legally did not exist at the moment of Hansen's statement since Youtz had expressly refused to handle the representation, this technical matter of privilege law is not dispositive. The question is not whether an actual privilege existed, but rather whether Hansen could reasonably have believed that the conversation was one clothed in confidentiality. Since an ordinary person would likely have believed that statements made to an attorney during an attempt to obtain representation would be confidential, it is instead more appropriate to infer that Hansen intended and believed that his statements would *not* be transmitted to the judge.[6]

Second, the objective evidence regarding Hansen's emotional state refutes the proposition that Hansen intended or knew that the statements would be transmitted to the judge. Hansen made his statement in a fit of pique not over something which the judge had done, but rather over a grievance created by Youtz. This suggests that at worst Hansen's "threat" was designed not to intimidate the judge but rather only to induce Youtz to take Hansen's case. More likely, the "threat" was merely Hansen's spontaneous expression of frustration at a system which he perceived to be unresponsive. The fact that Hansen's statement was made only once supports this conclusion. Hansen certainly would not have intended that such a spontaneous expression be communicated to the judge, nor

---

[6]I recognize the court today holds that attorneys have an affirmative obligation to disclose "true threats" to harm members of the judiciary. Majority, at 721. The question, however, is not whether Hansen's statements would be communicated to Judge Dixon, but whether Hansen intended or reasonably should have foreseen that they would be. Even if criminal defendants in the future will be held liable for knowing this relatively arcane rule of attorney conduct, it can hardly be applied to Hansen.

would he have had reasonable grounds to believe that it would be.

Third, Hansen did not even mention the judge by name during his entire conversation with Youtz. See Report of Proceedings (Testimony of Youtz), at 72. It would be extraordinary to believe that Hansen intended Youtz to transmit the statement to a judge whom he had not even named. It would also be extraordinary to conclude that Hansen knew or should have known that Youtz would determine the judge's name and then inform the judge.[7] It is, instead, entirely more consistent to believe that Hansen viewed his own statement in the same manner which a reasonable person would, as a brief display of temper and nothing more.

The evidence is therefore such that only one conclusion can be reached regarding Hansen's intent or knowledge: he did not intend nor did he have reason to believe that his statements would be transmitted to Judge Dixon. No rational trier of fact could therefore have concluded that all of the elements of RCW 9A.72.160 were satisfied, and Hansen's conviction should be reversed.

JOHNSON and MADSEN, JJ., concur with UTTER, J.

---

[7] Of course, Hansen certainly should have been aware that Youtz could perform this relatively simple task. Again, the question is not whether Hansen was aware that Youtz *could* tell the judge, but rather whether Youtz *would* tell the judge.