IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 31208-9-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ADRIAN BENTURA OZUNA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

BROWN, J. — Adrian Bentura Ozuna appeals his intimidating a witness conviction. He contends (1) the trial court erred in denying his CrR 3.6 motion to suppress, (2) the record lacks sufficient evidence for the jury to find the communication of an actual threat and the presence of gang aggravators, (3) the trial court improperly imposed a domestic violence (DV) assessment and costs of incarceration, and (4) a police officer improperly provided a sentencing statement. In his pro se statement of additional grounds for review (SAG), Mr. Ozuna contends the court erred in admitting gang evidence under ER 404(b). We accept the State's error concession concerning the imposition of the DV assessment, but find no error in Mr. Ozuna's other contentions. Accordingly, we affirm and remand to delete the DV assessment.

FACTS

While Mr. Ozuna was incarcerated at the Yakima County Jail on June 8, 2010, he was moved from one unit to another unit. Before the move, Mr. Ozuna's belongings were searched. Corrections officers found two letters Mr. Ozuna admits he wrote that were addressed to "Primo" and signed by "Primo." Report of Proceedings (RP) at 318. The Washington State Patrol Crime Lab for Forensic Analysis later determined the handwriting was Mr. Ozuna's. The letters contained threatening language that officers believed were directed at Augustin Jaime Avalos, Mr. Ozuna's fellow gang member, but a witness against him in a previous criminal case. One of the letters states, "bad things come to those that snitch." RP at 279. One letter called the recipient a "fucking trader" and that another gang "can have him." RP at 279. Soon after, Mr. Avalos was attacked in a jail holding cell. He received lacerations to his scalp and his upper lip. David Soto was the inmate who attacked Mr. Avalos. Mr. Ozuna, Mr. Avalos, and Mr. Soto all have ties to a gang known as the Sureños.

On June 25, 2010, Mr. Ozuna made a telephone call from the jail. The call indicated that he had been written up for witness tampering. He wanted to explain to the judge that he was mad when he wrote the letters.

The State charged Mr. Ozuna with intimidating a witness. The information contained a special allegation that the offense was committed "with intent to directly or indirectly cause any benefit, . . . to or for criminal street gang" and the offense was

2

committed to "obtain or maintain . . . membership . . . in . . . an organization." Clerks Papers (CP) at 1.

Mr. Ozuna unsuccessfully requested CrR 3.6 suppression of the letters seized from his cell. During the suppression hearing, a corrections officer testified Mr. Ozuna was on a watch mail list and inmates on this list have their mail opened. The court concluded, "The Defendant was placed on the mail watch list based on a prior incident. As an inmate with a prior similar incident, the defendant has a lessen[ed] expectation with regards to his mail." CP at 210. The court further concluded, "The defendant also did not have a reasonable expectation of privacy because the jail had a legitimate governmental interest in maintaining order and discipline within its confines to preserve the safety of the staff and other individuals in and out of the jail as well as institutional security." CP at 210.

Sunnyside Police Officer, Jose J. Ortiz, testified as a gang expert at trial. He testified that gangs commit various crimes to enhance their personal status and to further group interests; and all gangs have a snitch code. Officer Ortiz indicated that the word "campana," which was contained in one of the letters, means the English word "bell." This referenced the Bel Garden Locos or Lokotes (BGL) gang. Both Mr. Avalos and Mr. Ozuna are members of the BGL. Officer Ortiz further testified that if a gang member snitches on another then retaliation will usually occur.

The jury found Mr. Ozuna guilty as charged. The jury found the crime was committed with the "intent to directly or indirectly cause any benefit, aggrandizement,

3

gain, profit, or other advantage to or for a criminal street gang." CP at 147. And, the jury found Mr. Ozuna committed the crime "to obtain or maintain his membership or to advance his position in the hierarchy of an organization." CP at 148.

During sentencing, Sunnyside Police Detective, Robert Layman, stated, "Intimidation is the biggest key that keeps gangs in power" and officers "would like, I guess, a message shown that that's not going to be tolerated." RP (Oct. 16, 2012) at 5.

The sentencing court imposed restitution costs, including $100 for "Domestic Violence Assessment." CP at 198. The court imposed incarceration costs of "$50.00 per day of incarceration or in the Yakima County Jail at the actual rate of incarceration but not to exceed $100.00 per day of incarceration." CP at 198.

Mr. Ozuna appealed.

## ANALYSIS

### A. Suppression Ruling

The issue is whether the trial court erred by denying Mr. Ozuna's CrR 3.6 motion to suppress the letters. He contends the court erred in concluding he had a lessened expectation of privacy and the jail had a legitimate governmental interest in maintaining order and discipline. We disagree.

"We review a trial court's denial of a CrR 3.6 suppression motion to determine whether substantial evidence supports the trial court's challenged findings of fact and, if so, whether the findings support the trial court's conclusions of law." *State v. Cole*, 122 Wn. App. 319, 322-23, 93 P.3d 209 (2004). Mr. Ozuna does not assign error to the trial

4

court's factual findings, so they are verities on appeal. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). We review the court's conclusions of law de novo. *State v. Eisfeldt*, 163 Wn.2d 628, 634, 185 P.3d 580 (2008).

Although the Supreme Court in *Stroud v. United States*, 251 U.S. 15, 40 S. Ct. 50, 64 L. Ed. 103 (1919), appears to have authorized inspection of prisoners' mail, most modern decisions recognize that, under *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), "[T]he focus is on whether the authorities violated a justified expectation of privacy." 4 WAYNE R. LAFAVE, *Search and Seizure* § 10.9(c), at 744 (3d ed. 1996).

"One of the primary functions of government is the preservation of societal order through enforcement of the criminal law, and the maintenance of penal institutions is an essential part of that task. The identifiable governmental interests at stake in this task are the preservation of internal order and discipline." *Procunier v. Martinez*, 416 U.S. 396, 412-14, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989).

Washington courts applied the *Procunier* reasoning in *State v. Copeland*, 15 Wn. App. 374, 549 P.2d 26 (1976), where prison officials intercepted and read the contents of a letter written by an inmate who was suspected of being involved in a prison assault. The court held the evidence was admissible in the inmate's assault trial. *Id.* at 377-78.

Here, the trial court found that Mr. Ozuna, "a confirmed Sureños gang member, had written a note to another gang member. In this letter, the defendant brags about

5

how he sent another gang member to assault another inmate who he believed to be a snitch." CP 208-09 (Finding of Fact I). The court further found another letter "was addressed to another gang member and described how that person can redeem himself with the Sureños gang by assaulting a rival gang member." CP at 209 (Finding of Fact I). Next, the court found "[a]s a result of these letters, [Mr. Ozuna] was placed in a mail watch list. When an inmate is placed in the mail watch list, his outgoing mail is read to ensure that he is not violating a court order or violating any rules in the jail." CP at 209 (Finding of Fact I). The court then found that evidence showed "the importance of rules and discipline or internal order within the jail to ensure the safety of the staff and everyone in the jail." CP at 209 (Finding of Fact II).

These unchallenged findings are sufficient to show Mr. Ozuna had a lessened expectation of privacy based on his prior letters and that there was a legitimate government interest of the jail's to protect other inmates. Accordingly, the trial court did not err in allowing the evidence and denying Mr. Ozuna's CrR 3.6 motion to suppress.

B. Evidence Sufficiency

The issue is whether sufficient evidence supports Mr. Ozuna's intimidating a witness conviction and the gang aggravator. He contends first, he did not communicate a threat, and second, no evidence shows the incident was gang related.

Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, it would permit any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d

1068 (1992). An insufficiency claim admits the truth of the State's evidence and requires that all reasonable inferences be drawn in the State's favor and interpreted most strongly against the defendant. *Id.* Circumstantial evidence is equally as reliable as direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

First, to prove a charge of intimidating a witness, the State must show beyond a reasonable doubt that Mr. Ozuna, by use of threat against a current or prospective witness, attempted to influence the testimony of that person or to convince the person to absent himself or herself from proceedings. RCW 9A.72.110. "Threat" as used in RCW 9A.72.110 means, "To communicate, directly or indirectly, the intent immediately to use force against any person who is present at the time; or . . . as defined in RCW 9A.04.110(27)."[1] RCW 9A.72.110(3)(a)(i), (ii). Under RCW 9A.04.110(28)(a), "threat" means to communicate, directly or indirectly the intent . . . [t]o cause bodily injury in the future to the person threatened or to any other person."

Here, Mr. Avalos was a witness against Mr. Ozuna in a previous criminal case. They were members of the same gang. When an officer was moving Mr. Ozuna from one cell to another he discovered letters with threats that "bad things come to those that snitch." RP at 279. Mr. Avalos was attacked soon after. Mr. Ozuna argues the letters alone are insufficient to show a threat was communicated. But, as the State points out, the letters are circumstantial evidence not direct evidence. And, circumstantial evidence is equally as reliable as direct evidence. *Delmarter*, 94 Wn.2d at 638.

---

[1] The legislature changed RCW 9A.04.110(27) to RCW 9A.04.110(28) in 2011.

7

Significantly, "[n]o Washington court has ever held that a true threat is an essential element of any threatening-language crime." *State v. Tellez*, 141 Wn. App. 479, 483, 170 P.3d 75 (2007). Here, in addition to the letters, there is evidence of a history between the men, testimony about gangs and retaliation, and Mr. Ozuna's telephone conversation about being mad when drafting the letters.

Mr. Ozuna's reliance on *State v. Hosier*, 157 Wn.2d 1, 133 P.3d 936 (2006) is unpersuasive. There, the court held, "[u]nless a person's message is both transmitted by the person and received by the minor, the person has not communicated." *Id.* at 9. But, the court, there, was addressing the offense of communication with a minor for immoral purposes, an offense that is distinct with different elements from intimidating a witness.

We view the evidence in the light most favorable to the State, draw all reasonable inferences in the State's favor, and interpret this evidence most strongly against Mr. Ozuna. Applying this standard, we agree the evidence sufficiently supports the jury finding of the essential elements of intimidating a witness beyond a reasonable doubt.

Second, a finding of fact supporting an exceptional sentence will be reversed solely when "'no substantial evidence'" supports it. *State v. Jeannotte*, 133 Wn.2d 847, 856, 947 P.2d 1192 (1997) (quoting *State v. Grewe*, 117 Wn.2d 211, 218, 813 P.2d 1238 (1991)). A court may impose a sentence higher than the standard range if a jury finds "[t]he defendant committed the offense with the intent to directly or indirectly cause

8

any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang as defined in RCW 9.94A.030, its reputation, influence, or membership." RCW 9.94A.535(3)(aa). Or, the offense was committed "to obtain or maintain . . . membership or to advance . . . position in the hierarchy of the organization." RCW 9.94A.535(3)(s).

Some evidence must show gang involvement actually motivated the defendant to commit a crime to support RCW 9.94A.535(3)(s)'s gang aggravating factor. *State v. Yarbrough*, 151 Wn. App. 66, 210 P.3d 1029 (2009). In *Yarbrough*, Mr. Yarbrough yelled gang-related insults and challenges before shooting two people. *Id.* at 97. The evidence showed Mr. Yarbrough's gang had a run-in with a rival gang a few days prior to the shooting and Mr. Yarbrough believed the victims were members of that rival gang. *Id.* In *State v. Monschke*, 133 Wn. App. 313, 135 P.3d 966 (2006), Mr. Monschke and three other white supremacists beat a homeless man to death. *Id.* at 318-19. In both cases, some evidence showed the defendants committed their crimes because of their gang membership. Testimony from police or other gang experts is insufficient, standing alone, to support the aggravating factor. *State v. Blueshorse*, 159 Wn. App. 410, 431, 248 P.3d 537 (2011).

Here, Mr. Ozuna was a member of the Sureños gang and wrote letters referencing a gang. A gang expert testified without objection to gangs and gang culture. He was asked specific questions based on his expertise regarding signs, rules and orders. The officer testified specifically about the content of the letters pointing out

9

specific BGL gang sections. The officer pointed to specific passages and sections in the seized letters, as well as the signature that would identify that this letter was written by a person who was a BGL. The officer testified to actions taken against a person who was declared a "RATA" or rat; a snitch. RP at 446. The officer addressed breaking the silence code and consequent retaliation. Lastly, the officer testified to the reputation of a gang member who had been snitched on and did nothing in return.

Based on the above, the jury could, in weighing the testimony and deciding credibility from the sufficient evidence presented, infer the offense was committed to directly or indirectly cause benefit to a gang or to advance Mr. Ozuna's position in a gang. Considering all, we conclude the evidence is sufficient to prove the gang aggravator. Therefore, the sentencing court properly imposed an exceptional sentence.

## C. Sentencing Hearing Remarks

The issue is whether the sentencing court improperly considered Detective Layman's statement during Mr. Ozuna's sentencing hearing. Mr. Ozuna contends allowing an officer to provide a statement at a sentencing hearing is inappropriate.

Mr. Ozuna fails to provide legal authority to support his argument. On the other hand, RCW 9.94A.500 provides that prior to sentencing "[t]he court shall . . . allow arguments from the prosecutor, the defense counsel, the offender, the victim, the survivor of the victim, or a representative of the victim or survivor, and an investigative law enforcement officer as to the sentence to be imposed." Detective Layman was a law enforcement officer, who requested a high-end sentence because "[i]ntimidation is

10

the biggest key that keeps gangs in power" and officers "would like, I guess, a message shown that that's not going to be tolerated." RP (Oct. 16, 2012) at 5. Under RCW 9.94A.500, his statement was properly considered by the court prior to sentencing.

### D. DV Assessment and Costs

The issue is whether the sentencing court erred by imposing a DV assessment and costs of incarceration. The State concedes the DV assessment was wrongly imposed. Because the offense does not involve domestic violence, we accept the State's concession and remand for sentence correction. *See State v. Naillieux*, 158 Wn. App. 630, 646, 241 P.3d 1280 (2010) (remedy for minor error in judgment and sentence is remand to the trial court for correction).

Turning to the costs of incarceration, for the first time on appeal, Mr. Ozuna contends the court erred in not making a determination on the record regarding his current or future ability to pay costs of incarceration. Mr. Ozuna asks us to strike the requirement that he pay costs of incarceration, but we note under RAP 2.5(a)(3), solely manifest errors implicating a specifically identified constitutional right may be raised for the first time on appeal.

In *State v. Blazina*, 174 Wn. App. 906, 911, 301 P.3d 492, *review granted*, 178 Wn.2d 1010, 311 P.3d 27 (2013), Division Two of this court held that legal financial obligation[2] (LFO) issues may not be raised for the first time on appeal. Agreeing with

---

[2] "[C]ost of incarceration" imposed by RCW 9.94A.760(2) fall within the broad definition of "legal financial obligations." *In re Pers. Restraint of Pierce*, 173 Wn.2d 372, 379, 268 P.3d 907 (2011).

*Blazina*, this court recently held, "The ability to pay LFOs is not an issue that defendants overlook–it is one that they reasonably waive - we view this as precisely the sort of issue we should decline to consider for the first time on appeal." *State v. Duncan*, ___ Wn. App. ___, ___ P.3d ___ (2014 WL 1225910 at *4 (Mar. 25, 2014). Based on recent legal authority, Mr. Ozuna is precluded from raising the costs issue for the first time on appeal.

### E. Gang Affiliation Evidence

In his pro se SAG, Mr. Ozuna alleges the trial court abused its discretion when it admitted evidence of gang affiliation under ER 404(b). We disagree.

We review ER 404(b) evidentiary rulings for abuse of discretion. *Yarbrough*, 151 Wn. App. at 81. A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007). A trial court abuses its discretion when it relies on unsupported facts, takes a view that no reasonable person would take, applies an incorrect legal standard, or bases its ruling on an erroneous legal view. *Id.* at 284.

Courts consider evidence of gang affiliation prejudicial. *State v. Asaeli*, 150 Wn. App. 543, 579, 208 P.3d 1136 (2009) (noting "the inflammatory nature of gang evidence generally"). Therefore, a nexus must exist between the crime and the gang before the trial court may find the evidence relevant. *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009). Courts may admit gang affiliation evidence to establish the motive for a

12

crime or to show that defendants acted in concert. *Id.* at 527. Gang evidence falls within the scope of ER 404(b). *Yarbrough*, 151 Wn. App. at 81. A trial court may admit gang evidence offered for proof of motive, intent, or identity. *Id.* But before the trial court may admit such evidence, it must "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." *Id.* at 81-82.

Mr. Ozuna failed to object to evidence regarding his gang membership under ER 404(b). Indeed, evidence presented shows he was a self-professed Sureños member. Because Mr. Ozuna did not object at trial to the State's gang evidence on ER 404(b) grounds, we will not address this argument for the first time on appeal. *See State v. Boast*, 87 Wn.2d 447, 451, 553 P.2d 1322 (1976) (party may assign error in appellate court only on specific ground of evidentiary objection made at trial).

Affirmed and remanded for sentence correction.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW

13

No. 31208-9-III
*State v. Ozuna*

2.06.040.

Brown, J.
_____
Brown, J.

I CONCUR:

Korsmo, J.
_____
Korsmo, J.

No. 31208-9-III

SIDDOWAY, C.J. (dissenting in part) — The State lacked evidence that Adrian

Bentura Ozuna shared with anyone the contents of his unsealed, unstamped letter

pledging vengeance against a witness, which corrections officers found in Mr. Ozuna's

personal effects at the county jail. When Augustin Jaime Avalos (the evident target of

the letter) was assaulted in a holding cell a month after Mr. Ozuna's letter was

discovered, the State developed no evidence that Mr. Ozuna had communicated with

David Soto, who was ultimately charged with the assault.

The State's evidence against Mr. Ozuna amounted to evidence of a vengeful

attitude but it included no evidence of when or where he is believed to have

communicated that threat to anyone else. For the gang aggravators, the State offered only

evidence that Mr. Ozuna wanted to see Mr. Avalos punished and that Mr. Avalos was

thereafter assaulted. Our standard for reviewing the jury's findings that Mr. Ozuna is

guilty of intimidating a witness and of two gang aggravators is highly deferential but we

must still be satisfied that a rational juror could have found guilt "beyond a reasonable

doubt." This is the rare case where insufficient evidence supports the jury's verdict.

More details on the timeline and events will help demonstrate my concern. It was

on June 8, 2010 that corrections officers found two letters in Mr. Ozuna's belongings

during a cell change, only one of which included the threats resulting in the State's

charge. That four-page handwritten letter was addressed to "Primo" and was also signed

"Primo," meaning "cousin." It can clearly be read as expressing the writer's request that

vengeance be carried out against a witness. The jury was instructed on what was required

for a true threat and substantial evidence supported the jury's implicit finding that the

letter contained true threats. There was substantial evidence that the letter was written by

Mr. Ozuna; by the time of trial, the defense admitted that he wrote it. There was

substantial evidence that the witness that Mr. Ozuna wanted to see punished was Mr.

Avalos, who had testified against Mr. Ozuna in connection with a crime committed in

2008 for which Mr. Ozuna was soon to be sentenced. The letter is reasonably read to ask

that action be taken on June 25, the date set for Mr. Ozuna's sentencing:

> So now you know what I want primo, don't hesitate vato. take action reep
> the rewards later. Don't think, just act. thinking is already hesitating. hit
> me up when after the shit get's handled. Do it on the 25 cause that's when I
> have court, I want to have a smile on my face that day knowing that, that
> fool's getting a lil tast of what's comeing to him. The 25 is the day I get
> sentenced. Good looking out primo, don't let me down fucker! I knew I
> could depend on you, a lil late but better late than never, que-no.

State Ex. 1D (errors in original).

At issue is whether the threats reflected in the letter were communicated. The

letter was found in an unsealed, unstamped envelope, although it was addressed to Laura

Garces and bore, as a return address, another inmate's name and number. No evidence

was offered as to the existence of a person named "Laura Garces" and defense counsel

argued during closing, and without objection, that "[n]obody seems to know who Laura Garces was." Report of Proceedings (RP) at 547.

After being seized by corrections officers on June 8, the letters were turned over on June 14 to Detective Erica Rollinger, who had arrested Mr. Ozuna and Mr. Avalos for the 2008 crime for which Mr. Ozuna was about to be sentenced. Detective Rollinger met with Mr. Avalos on June 22 and showed him the threatening letter. The detective's presentation of the letter to Mr. Avalos was the first time he saw the letter or heard that Mr. Ozuna was making threats.

At 6:26 a.m. on the morning of the June 25 sentencing date, jail personnel recorded a telephone call from Mr. Ozuna that Detective Rollinger later listened to and construed to be between Mr. Ozuna and several people on the receiving end of the call, including, she believed, Mr. Ozuna's father. Among other things, Mr. Ozuna and whomever he called discussed the afternoon's sentencing. The State offered the recording as an admission by Mr. Ozuna that he was the writer of the threatening letter; during the conversation, he told the person whom Detective Rollinger believed to be his father that jail staff had written him up for threatening a witness and he was concerned the letter would be brought to the attention of the sentencing judge. He explained how he planned to deal with the letter if it came up:

> If anything I'm going to try to be prepared and I'm like hey man, you've got to understand, you know, I'm doing ten years because of this gato and I was mad and—[inaudible on tape—language]—you know? Try to just set

3

that whole shit down. Hey, I wrote it in—in a time of passion and, you know?

RP at 390 (alteration in original). No transcript of the sentencing hearing is included in the record on appeal, so we do not know whether the letter or the sanctions imposed on Mr. Ozuna for possessing it were raised during the sentencing hearing.

A couple of weeks after Mr. Ozuna's sentencing, a transport officer who was escorting a lawyer into a holding area to see an inmate found Mr. Avalos on the floor of the holding area, bleeding profusely from what appeared to be a head wound. There were seven other individuals in the holding area at the time. Mr. Avalos claims that he was struck in the back of the head and fell, hitting a bench. He was treated for a laceration on the back of the head and a lacerated upper lip. The individuals in the holding area at the time were not cooperative when the transport officer questioned them about what had happened. It is undisputed that Mr. Ozuna was in custody on a different floor of the jail at the time of the assault.

The State eventually charged David Soto with the assault on Mr. Avalos. While the State would later present evidence that Mr. Soto was a member of the Sureños, the same gang to which Mr. Ozuna belonged, it offered no evidence of any other connection or communications between the two.

Mr. Ozuna argues that the State presented insufficient evidence of the intimidation charge or the two gang aggravators found by the jury.

4

No. 31208-9-III – dissent
*State v. Ozuna*

With respect to his conviction for intimidation of a witness, Mr. Ozuna challenges the sufficiency of the evidence to establish that he "*direct[ed] a threat* to a former witness," a component of the crime on which the jury was instructed. RCW 9A.72.110(2) (emphasis added).[1] He argues that what was missing from the State's evidence was evidence of any "communication" of the threat as required by former RCW 9A.04.110(27) (2007) (now subsection (28) of the statute) on which the jury was also instructed, as follows:

> ["]Threat["] means *to communicate, directly or indirectly*, the intent to cause bodily injury in the future to the person threatened; or to do any other act which is intended to harm substantially the person threatened with respect to his health or safety.

Clerk's Papers at 160 (Instruction 8) (emphasis added).

---

[1] The to-convict instruction read, in its entirety:
To convict the defendant of the crime of Intimidating a Witness, each of the following elements of the crime must be proved beyond a reasonable doubt:
(1) That on or about or between June 8, 2010 and July 9, 2010, the defendant directed a threat to a former witness because of the witness' role in an official proceeding; and
(2) That this act occurred in the State of Washington.
If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.
Clerk's Papers at 157 (Instruction 5).

5

The State appears to defend the sufficiency of its evidence against Mr. Ozuna on two alternative grounds. With respect to the intimidating a witness charge, it makes one argument that we should read *State v. Hansen*, 122 Wn.2d 712, 862 P.2d 117 (1993); *State v. Anderson*, 111 Wn. App. 317, 44 P.3d 857 (2002); and *State v. Williamson*, 131 Wn. App. 1, 86 P.3d 1221 (2004) as requiring no communication to a third party at all, but only the writing-down of a threat against a former witness.

As alternative support for the sufficiency of the intimidation evidence and as support for the sufficiency of evidence to support the jury's findings of the gang aggravators, it argues that the fact that an assault occurred on July 9 is sufficient circumstantial evidence that Mr. Ozuna communicated the threat to some third party sometime before July 9. I address the State's arguments in turn.

Hansen, Anderson, *and* Williamson *as authority that no communication to another person is required*

In *Hansen*, our Supreme Court construed statutory language and a definition associated with the crime of intimidating a judge. The defendant had verbally expressed a threat "'to get a gun and blow . . . away'" a judge—not *to* the judge, but in a conversation with a lawyer. 122 Wn.2d at 715. At issue was whether, to prove that a threat was "directed" at a judge, the State was required to prove that the defendant's threat was made with the intention or knowledge that it would reach the judge.

6

The statute defining the crime of intimidating a judge examined in *Hansen* is virtually identical to the language defining the crime of intimidating a witness with which we are concerned. *See* RCW 9A.72.160 (criminalizing, inter alia, "direct[ing] a threat to a judge because of a ruling or decision of the judge in any official proceeding"). RCW 9A.72.160 and RCW 9A.72.110 both incorporate the definition of "threat" as defined in RCW 9A.04.110. It includes the threat of future harm relevant in both cases: "communicat[ing], *directly or indirectly* the intent [t]o cause bodily injury in the future to the person threatened or to any other person." Former RCW 9A.04.110(27)(a) (emphasis added).

The five-member majority in *Hansen* held that to prove intimidation of a judge, the State was not required to prove that a threat was made by a defendant with the intent or knowledge that it would reach the judge, explaining that the statutory definition

> evidences a clear intent by the Legislature that RCW 9A.72.160 include threats communicated in an indirect fashion as well as direct threats. To carry out this legislative intent . . . the statute must be construed as a whole by incorporating the definition . . . . *Under this interpretation, whoever threatens a judge, either directly or indirectly, e.g., through a third person,* because of an official ruling or decision by that particular judge, is chargeable under RCW 9A.72.160.

122 Wn.2d at 718 (emphasis added).

The four members of the Supreme Court who concurred or dissented in *Hansen* were of the view that the statute should be construed to require that a defendant intended or was aware that his threat would be communicated to the target judge. One justice

7

concurred in the result of the majority's opinion on the basis that the evidence was sufficient to establish the defendant's intent or knowledge that the threat would be communicated. Three justices dissented on the basis that the evidence was insufficient to establish that intent or knowledge on the part of the defendant.

In *Anderson*, this court applied *Hansen*'s construction of the judicial intimidation statute to the witness intimidation statute, finding their subject matter and purposes to be the same. The defendant in *Anderson* communicated a threat to harm his community corrections officer and a child protective services (CPS) investigator in phone calls and a letter directed to third parties. The letter, which the defendant sent to his mother, included a notation, "'Throw this in the trash when done reading it *please!*'" 111 Wn. App. at 320. The defendant argued that he never intended his threats to be communicated to his community custody officer and the CPS investigator. This court held, citing *Hansen*, that his intent in that regard did not matter; "[i]t is enough if threats are directed to a third party." *Id.* at 322.

*Williamson* involved the same context of witness intimidation committed indirectly; the defendant spoke with one victim, asking him to convey to another victim a threat of adverse consequences if she were to testify against him. The *Williamson* court cited *Hansen* and *Anderson* for their holdings that intimidation statutes are violated even if the threat is not communicated to the victim.

8

*Hansen*, *Anderson*, and *Williamson* do not support the conclusion that the letter alone is sufficient evidence of intimidating a witness; accepting the State's position that the letter is sufficient requires going beyond the holdings of those three cases and holding, in effect, that a defendant can "communicate" a threat merely by writing it down.

The statute does not define "communicate." Where there is no statutory definition to guide us, words should be given their ordinary meaning. *State v. Roden*, 179 Wn.2d 893, 904, 321 P.3d 1183 (2014). The transitive verb "communicate" is defined to mean "**2a** : to make known : inform a person of : convey the knowledge or information of <~ the news> <~ his secret to a friend> **b** : IMPART, TRANSMIT <~ his pleasure to us> <an odor *communicated* to one's fingers> <*communicating* the disease to others>." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 460 (1993). "Communicate" cannot reasonably be understood to include the creation of a private record. Proof that Mr. Ozuna wrote the letter, standing alone, is insufficient to prove intimidation of a witness.

> *The July 9 assault of Mr. Avalos as "circumstantial*
> *evidence" that Mr. Ozuna communicated his threats to a*
> *third person and as support for the gang aggravators*

Alternatively, the State relies on its proof that Mr. Avalos was assaulted on July 9 as circumstantial evidence that Mr. Ozuna conveyed his threats to a third party.

During the course of trial, the jury was presented with evidence, mostly from the State's witnesses, that having testified against a fellow Sureño Mr. Avalos faced a risk of harm from multiple quarters.

9

Corrections Lieutenant Gordon Costello testified that the statement "bad things come to those that snitch" was a true statement in his experience as a corrections officer, that it was not always the person who gets "snitched on" that does the "bad things," and that revenge based on snitching was "common in jail[,] period." RP at 279, 286-87, 289. Transport Officer Roberta Gamino testified that it is dangerous to be a snitch and that many inmates will attack a snitch. RP at 301-02. Police Officer Jose Jaime Ortiz, the State's expert on gang culture, testified that a "no snitch code" is one of the "main staples" of gang culture. RP at 437. While he testified that the directive to retaliate against a snitch must generally come from someone with a mid- to upper-level status in a gang, he did not suggest that Mr. Ozuna was the only one who could have given the directive to assault Mr. Avalos and he acknowledged that sometimes even junior members of a gang will take retaliatory action although not authorized to do so. Mr. Avalos testified himself that when he spoke with Detective Rollinger about Mr. Ozuna's letter, he expressed concern to the detective—not about Mr. Ozuna doing anything, "[j]ust other people in general." RP at 417.

A defense witness, Corrections Corporal Loren Merriman, testified that based on his "numerous" experiences with situations where one gang member has testified against another gang member, word gets around the jail "very quickly," and measures are taken in order to try to protect the witness by separating him from others. RP at 486-87. He testified that the attack or threat to a witness could come from "anybody within their—it

10

doesn't even have to be their own gang. If somebody knows that somebody testified and that word gets back to the jail it gets around fairly quickly and then word gets out that the guy is—needing to be kept away from everybody else." RP at 488.

Despite this evidence of a general peril that a gang member who has testified against another gang member faces, despite the State's presenting no evidence of a connection between Mr. Ozuna and Mr. Soto other than that they were both Sureños, and despite its offering no theory of when and to whom Mr. Ozuna conveyed an order to assault Mr. Avalos, the State makes the alternative argument that the attack on Mr. Avalos—even though on a date other than that specified by Mr. Ozuna's letter—was sufficient circumstantial evidence to prove the intimidation charge and gang aggravators beyond a reasonable doubt. It asked the jury to make a connection between Mr. Ozuna and Mr. Soto even though personnel of the jail (whom the jury had been told would follow enhanced measures for Mr. Avalos's security) evidently did not recognize a connection when they placed Mr. Soto in the holding area with Mr. Avalos.

In my view, no rational juror could have found the elements of the crime or the aggravators beyond a reasonable doubt. I respectfully dissent on the issue of the sufficiency of the evidence.

_____
Siddoway, C.J.

11