## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
### DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 30437-0-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | OPINION PUBLISHED IN |
| | ) | PART |
| KATHY ANN HENDRICKSON | ) | |
| | ) | |
| Appellant. | ) | |

KORSMO, C.J. — Kathy Ann Hendrickson uses the internet to avenge herself on people she does not like. Her activities led to ten convictions including three counts of cyberstalking, two counts each of threatening to bomb, felony harassment, and intimidating a public servant, and a single count of second degree identity theft. Concluding that a candidate for judicial office is not a public servant and that a threat to bomb must target a location, we reverse three convictions, affirm the remainder, and remand for resentencing.

### FACTS

Ms. Hendrickson took her anger out both on a former boyfriend and on her daughter's work supervisor; two judges became the primary victims of the campaign against the supervisor. Although there was some similarity of tactics and a partially overlapping time frame, the two efforts were discrete.

Ms. Hendrickson was convicted in 2006 of stalking a boyfriend, JF, whom she met online. After developing an intimate relationship, JF broke up with Ms. Hendrickson. His life became quite difficult thereafter. Ms. Hendrickson tried to break into his house. A woman who spent the night with JF at his house woke up to find her tires slashed. Another time, JF came home to find his outside water directed into and flooding a crawlspace in his house; he also found the cable to his house cut. He would get strange calls at work and strange harassing e-mails; someone stole his identity. A woman who he communicated with on a dating web site received threatening e-mails purportedly from JF, which caused him legal trouble. Phony dating accounts and e-mail addresses were set up in his name. Ms. Hendrickson was ultimately convicted of stalking JF.

GR met Ms. Hendrickson on an online dating site in 2005 and the pair developed an intimate relationship. After dating seven or eight months, GR decided to break up with Ms. Hendrickson because the relationship "wasn't really going anywhere." Report of Proceedings (RP) at 11. The break up appeared amicable and the couple remained "friends with benefits." Nonetheless, GR's life also became more difficult. He started receiving e-mails, purportedly from JF, that threatened his life. He also received phone calls from a synthesized/masked voice threatening his life. GR's tires were also slashed

2

on three separate occasions. Another time, he came home to find Ms. Hendrickson in his kitchen, uninvited, and believed that she had accessed his personal computer.

The police started coming to his house with audio recordings of someone purporting to be him trying to solicit sex for money. He was accused twice of being a pedophile. He almost lost his job after a woman who received threatening e-mails from a person purporting to be GR reported the incident to his employer. These allegations resulted in GR being arrested twice, including one arrest at work in front of his coworkers and friends. The charges were eventually dropped after police realized the threatening e-mails were coming from a Walla Walla IP[1] address rather than GR's Oregon IP address. Some of these e-mail accounts had Walla Walla Community College IP addresses.

Another time, GR came home to find the electric utility attempting to shut off his electricity. They had received a false report that he was moving. Similar incidents happened with his cable and Internet providers. Checks that GR wrote started bouncing because his military pension was readdressed to New York without his permission. He also started getting charges from online retailers that he did not authorize. GR had to work diligently to keep these incidents from affecting his credit.

---

[1] Internet Protocol

He later got a restraining order against Ms. Hendrickson when he started to suspect that she was the cause of his problems. But, even after getting the protective order, GR would still see Ms. Hendrickson for sexual encounters. After GR moved away to Kentucky in 2008, he continued to have problems. A Facebook page was opened in his name seeking a hit man. An anonymous person also e-mailed his supervisors in Kentucky saying that he had harassment charges pending in Washington State, that he had profiles on several casual dating web sites, and that he was under investigation for child molestation.

A search of Ms. Hendrickson's apartment revealed sheets of usernames and passwords belonging to GR, his credit card information, and his Social Security number. This information also included the name and e-mail address of the woman who was purportedly harassed by GR. Police also found some mail in Ms. Hendrickson's apartment addressed to GR.

Ronald Emmons, a forensic document examiner for the Oregon State Crime Lab, testified regarding the identity of a person who filled out credit card applications in GR's

4

name. Mr. Emmons determined that the handwriting on the applications matched Ms. Hendrickson's handwriting.[2]

Emily Banks, supervisor of the Walla Walla Community College computer lab, regularly saw Ms. Hendrickson using the lab. On one occasion Ms. Banks viewed Ms. Hendrickson's terminal remotely and observed that she was on a dating site searching for someone in Kentucky. The police seized the computer shortly thereafter.

Although GR's departure from the state did not end Ms. Hendrickson's interest in his life, it did give her more time to target other people. She turned her attention to her daughter's supervisor at a local retail store, Ms. Diana Duede. In 2008, Judge Richard Wernette, then a municipal judge as well as a practicing lawyer, was involved in an election campaign against Judge John Lohrmann, then also a practicing lawyer, for superior court. On July 31, 2008, Judge Wernette received the following e-mail:

So You Want To Be Elected:

What a joke you have become. You think anyone really wants you to be elected to serve our community. NO. We do not. I will put a stop to all of your rediculous (sic) nonsense. YOU ARE A JOKE! I will see to it you do not become elected. Better check before you leave your home. You never know what is out there to encounter you. Maybe when you start your car, it

---

[2] A handwriting analysis was also done by the Washington State Crime Lab, but their result was "inconclusive."

> will go BOOM! Get the hint! Say your prayers. YOU might not see
> tomorrow.
>
> Diane Duede
> Washington

Ex. 8. Judge Wernette immediately interpreted it as a threat against his life and against

his family; he forwarded the e-mail to law enforcement.

On August 14, 2008, Judge Wernette and Judge Lohrmann both received the

following e-mail:

> Election is finally coming to a halt. Are you ready for the BIG BOOM! If
> elected. YOU will pay the ultimate price. Get it. You are the biggest
> losers to even be appointed. Life is so short. The end is near. Say your
> goodbyes.
>
> Diane Duede
> College Place, Washington

Ex. 7.[3] The e-mail address used to send the judicial e-mail message was

dianeduede@yahoo.com. According to the State's theory of the case, *Diane* Duede was a

misspelling of *Diana* Duede. Ms. Duede testified that she does not use the Internet, does

not have an e-mail account, and that the e-mails misspelled her first name.

---

[3] The same message was also sent to Justice Debra Stephens who was on the ballot
that year for the Washington Supreme Court. The message was not received due to an
error in the e-mail address and the prosecutor dropped charges relating to Justice
Stephens.

6

Police eventually connected Ms. Hendrickson to the dianeduede e-mail address through a series of other e-mail addresses. In 2009, the store received an anonymous customer complaint about Ms. Duede's treatment of Ms. Hendrickson's daughter. The complaint came from an e-mail address of lovelifenow111@yahoo.com; that address later was used to harass GR.

Police subsequently linked the lovelifenow111 account to casablanca@hotmail.com, which was the e-mail address linked to the lovelifenow111 account for password retrieval purposes. The computer lovelifenow111 accessed to send messages about GR was registered to Walla Walla Community College. Police also discovered that lovelifenow111 also was accessed on Ms. Hendrickson's daughter's computer, another machine that Ms. Hendrickson used to access the Internet. The casablanca@hotmail.com was also the password retrieval address for dianeduede@yahoo.com. The linking of all these e-mail addresses suggested that Ms. Hendrickson had control of the dianeduede address used to send the threatening messages to the judges.

Detective Richard Maidment of the College Place Police Department investigated the crimes against GR and the judges. He searched Ms. Hendrickson's daughter's computer, a computer from Whitman College, and a computer from Walla Walla

7

Community College. The e-mails that GR's Kentucky employer received were traced back to Walla Walla Community College. The computer seized from the college immediately after Ms. Hendrickson was seen using it contained a lot of information that was also found on her daughter's computer. It also had been used to access one of GR's personal accounts.

The computer from Whitman College was used by someone on AdultFriendFinder (a casual dating web site) going by Amyisfun2Bwith. GR suspected that this person was actually Ms. Hendrickson. Detective Maidment confirmed this suspicion when he followed her to Whitman College and observed her using the computer, which was later determined to have accessed the Amyisfun2Bwith account. It was also used to both place an order using GR's credit card and to contact a woman who thought she was being harassed by GR.

Detective Mike Boettcher of the Walla Walla Police Department testified that Ms. Hendrickson's daughter's computer was used to access an e-mail account in GR's name. Some of these e-mail accounts in GR's name and in other names were accessed on all three computers; Ms. Hendrickson's name also showed up in the three computers. GR could not have accessed any of these computers because he was in Kentucky during the relevant time period.

8

After completion of a very thorough investigation, the matters were referred to the prosecutor's office. Ultimately, eleven counts were heard by a jury. The July 31 e-mail was the basis for a threat to bomb count as well as harassment and intimidating a public servant charges listing Judge Wernette as the victim. The August 14 e-mail was the basis for a second threat to bomb charge as well as harassment and intimidating a public servant charges that listed Judge Lohrmann as the victim. The jury convicted on the previously noted ten offenses and acquitted on a stalking count involving GR. Ms. Hendrickson received a standard range sentence and timely appealed to this court.

## ANALYSIS

Ms. Hendrickson's appeal challenges the threat to bomb conviction involving the August 14 e-mail to Judge Wernette, the two convictions for intimidating a public servant, and the trial court's decision to permit the evidence of her stalking of former boyfriend JF. She also filed a pro se statement of additional grounds (SAG). We will address the intimidating a public servant and threat to bomb convictions in the published portion of this opinion. The remaining matters will be discussed in the unpublished portion.

9

*Intimidating a Public Servant*

Ms. Hendrickson argues that the intimidating a public servant statute does not apply to candidates for public office. She also argues that while Judge Wernette was a judge during the election campaign, there was no evidence that the threat was directed at his actions as a public servant. We agree with both of her arguments and reverse these two convictions.

Evidence is sufficient to support a conviction if it permits the trier of fact to find beyond a reasonable doubt each element of the offense. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980). In reviewing such challenges, an appellate court will construe the evidence in the light most favorable to the prosecution. *Id.*

In relevant portions, the intimidating a public servant statute provides:

> (1) A person is guilty of intimidating a public servant if, by use of a threat, he or she attempts to influence a public servant's vote, opinion, decision, or other official action as a public servant.
> (2) For purposes of this section "public servant" shall not include jurors.

RCWA 9A.76.180(1)(2).[4]

---

[4] Attempts to improperly influence a juror's actions are punished by RCW 9A.72.140, the jury tampering statute.

In turn, a "public servant"

> means any person other than a witness who presently occupies the position of or has been elected, appointed, or designated to become any officer or employee of government, including a legislator, judge, judicial officer, juror, and any person participating as an advisor, consultant, or otherwise in performing a governmental function.

RCW 9A.04.110(23).

Ms. Hendrickson argues that a candidate for public office is not a "public servant" to whom the intimidation statute can apply. We agree. The definition of a public servant expressly is directed to those who hold government office or employment or who have been selected to do so. A candidate for election to office has not yet assumed office nor been chosen by the electorate to do so. While the definition of a public servant includes a candidate-elect, it does not include those who have not yet been selected for the position. Accordingly, the charge of intimidating a public servant did not apply to Judge Lohrmann. While he would win the election a few short days after the August 14 e-mail, he had not yet become a public servant by virtue of the electorate's blessing at the time of the e-mail. Accordingly, the evidence does not support the intimidation count related to Judge Lohrmann.

Ms. Hendrickson also argues that Judge Wernette was not a "public servant" by nature of his superior court candidacy. While we agree that Judge Wernette did not

11

qualify as a public servant by nature of his candidacy, Ms. Hendrickson's argument ignores the fact that Judge Wernette was already a public servant as a result of his position as a municipal court judge. The question then becomes whether the threat was an attempt to influence Judge Wernette's "vote, opinion, decision, or other official action." An election campaign is clearly not a vote, opinion, or decision. The remaining question is whether it is an "other official action" of a public servant.

"No court has addressed what constitutes 'official action' for the purpose of this statute, and there is no need to consider it here." *State v. Montano*, 169 Wn.2d 872, 878, 239 P.3d 360 (2010). Ms. Hendrickson's argument does require us to consider "official action" for this purpose. However, we need not extensively discuss the subject.

Just as being a candidate for public office does not make one a public servant, so too candidacy for public office is not itself an "official action" under this statute. The decision to run for office is a personal choice; it is not itself a function of being a public servant. While certain offices are filled by election, and those office holders frequently run for reelection, no office requires that its holder run for election as one of the functions of the job. Thus, although Judge Wernette was a public servant, his action in running for election was personal rather than official. The July 31 e-mail was directed toward his

12

candidacy rather than his official actions as a municipal judge. Accordingly, there was no basis for finding that the e-mail was intended to influence the judge's official action.

We find support for this approach in an analogous phrase in our bribery statute. That statute prohibits the offer or acceptance of a benefit for the purpose of influencing a public servant's behavior in his "official capacity." RCW 9A.68.010. When construing that undefined statutory term, our court succinctly stated: "it simply means that the public servant is acting within the scope of what he or she is employed to do as distinguished from being engaged in a personal frolic." *State v. O'Neill*, 103 Wn.2d 853, 859, 700 P.2d 711 (1985). This definition is consistent with what we believe an "official action" to be—action taken within the scope of a public servant's employment or service.

Running for election is not an "official action" of a public servant. The evidence was insufficient to support the conviction for intimidating Judge Wernette.

Both convictions for intimidating a public servant—counts 8 and 9—are reversed for insufficient evidence.

*Threat to Bomb*

Ms. Hendrickson attacks the sufficiency of the evidence supporting count 5, the threat to bomb conviction arising from the August 14 e-mail. Because it did not target a particular location, we agree that this e-mail did not constitute a threat to bomb.

13

The statute at question is RCW 9.61.160(1). It provides:

(1) It shall be unlawful for any person to threaten to bomb or otherwise injure any public or private school building, any place of worship or public assembly, any governmental property, or any other building, common carrier, or structure, or any place used for human occupancy; or to communicate or repeat any information concerning such a threatened bombing or injury, knowing such information to be false and with intent to alarm the person or persons to whom the information is communicated or repeated.

*Id.*

This statute was first enacted in 1959. *See* LAWS OF 1959, ch. 141. It was initially placed in the malicious mischief—property damage chapter of the criminal code. *See* former chapter 9.61 RCW (1961). The chapter retained that title when the modern malicious mischief offenses migrated to chapter 9A.48 RCW. The only one substantive amendment to the threat to bomb statute since its adoption was a 1977 amendment that placed "government property" within its protective sphere. LAWS OF 1977, Ex. Sess., ch. 231.

Based on the clear focus of the statute on protection of property rather than people, Ms. Hendrickson persuasively argues that the August 14 e-mail did not violate the statute because it did not indicate any structure or vehicle that was endangered. Instead, that e-mail simply threatened that both judges would go "boom," unlike the July 31 e-mail that

14

specifically mentioned Judge Wernette's car as the endangered object. The statute

expressly names a number of locations—typically structures or locations where people

gather, live, or use for transportation—that a person may not threaten to bomb. Human

beings are not protected under this statute, except indirectly from the protection of the

structures they use. Because the e-mail that served as the basis for count 5 did not

indicate that any place protected by RCW 9.61.160 was to be bombed, there was

insufficient evidence to support this conviction. Count 5 is reversed.

We reverse the convictions in counts 5, 8, and 9. The case is remanded for

resentencing on the remaining counts.

The remainder of this opinion has no precedential value. Therefore, it will be filed

for public record in accordance with the rules governing unpublished opinions. RCW

2.06.040.

*ER 404(b)*

Ms. Hendrickson finally[5] argues that the trial court erred in admitting evidence

relating to her stalking of former boyfriend JF. The trial court did not abuse its discretion

---

[5] Counsel also argues that the trial court erred by not considering the counts
arising out of the two e-mails as constituting the same criminal conduct per RCW
9.94A.589(1). In light of the fact that we are remanding this case for resentencing, we do

15

in its handling of this issue, and the evidence also was harmless in this case since it was primarily directed to the count on which the jury acquitted.[6]

Evidence of "other bad acts" is permitted to establish specific purposes such as the identity of an actor or the defendant's intent or purpose in committing a crime. ER 404(b). Those purposes, in turn, must be of such significance to the current trial that the evidence is highly probative and relevant to prove an "essential ingredient" of the current crime. *State v. Lough*, 125 Wn.2d 847, 863, 889 P.2d 487 (1995). Evidence admitted under ER 404(b) is considered substantive evidence rather than impeachment evidence. *State v. Laureano*, 101 Wn.2d 745, 766, 682 P.2d 889 (1984), *overruled in part by State v. Brown*, 113 Wn.2d 520, 782 P.2d 1013, 787 P.2d 906 (1989); *State v. Wilson*, 60 Wn. App. 887, 891, 808 P.2d 754 (1991).

The decision to admit evidence of other bad acts under ER 404(b), as with most evidentiary rulings, is a matter within the discretion of the trial court. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003); *Lough*, 125 Wn.2d at 863.

---

not address this argument. Ms. Hendrickson is free to bring it to the trial court if she so desires.

[6] Ms. Hendrickson also filed a SAG which we will not separately address. We have reviewed the arguments and conclude that the evidence does support the remaining convictions and that her counsel effectively represented her. Her other arguments are not supported by the record and have not been addressed.

Discretion is abused if it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Ms. Hendrickson argues that her mistreatment of JF should not have been admitted because it showed her propensity to be a bad person. In other words, she does not challenge the relevance of this evidence, but only the trial court's balancing of its value against its harm. We disagree and conclude that the trial court properly struck the balance in favor of admission.

As with JF, GR was undergoing a campaign of harassment that included slashed tires and recurring internet attacks after he broke off his relationship with Ms. Hendrickson. The identity of his harasser was at issue in the trial, and Ms. Hendrickson took great efforts to hide her identity through the use of a series of different online names and computers. The fact that she acted in a similar manner after breaking up with JF was important evidence in establishing her motive and her identity as the person harassing GR. Far from showing only that she was a bad person who behaved badly after the breakup, the evidence was highly relevant to show her identity due to the highly similar behavior used to target both men. The trial court did not abuse its discretion by concluding that the evidence was more probative than it was prejudicial.

17

Even if there had been error, it was harmless in light of the jury's acquittal on count 10. That count had alleged that Ms. Hendrickson stalked GR. The trial court had given a limiting instruction telling the jury that it could only consider JF's testimony for the purpose of determining whether Ms. Hendrickson had a plan of "harassment and/or stalking." Clerk's Papers (CP) at 84 (Instruction 46). That evidence was squarely directed at count 10, which required the State to prove that Ms. Hendrickson stalked GR by repeatedly harassing him. CP at 72 (Instruction 35). The jury acquitted on that count.

The court did not abuse its discretion by admitting the evidence that Ms. Hendrickson had stalked JF. The evidence went to the count on which she was acquitted, which would have made any error harmless.

Affirmed in part, reversed in part, and remanded for resentencing.

Korsmo, C.J.

WE CONCUR:

Kulik, J.

Siddoway, J.

18