# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

2017 FEB 13 AM 11: 20

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 76018-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW TOOMBS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: February 13, 2017 |

SPEARMAN, J. — Andrew Toombs was involved in a confrontation at the Fife Police Department in which he assumed a "fighting stance" and yelled at employees. Police officers struggled to arrest Toombs, who was charged with multiple counts of third degree assault and intimidating a public servant, as well as felony harassment and resisting arrest. Toombs was found not competent to stand trial, but experienced a 75-day delay before he was transferred to Western State Hospital to receive services to restore his competency. At trial, the jury convicted Toombs of two counts of third degree assault, intimidating a public servant, felony harassment, and resisting arrest. He appeals. We conclude as a matter of law that the evidence is insufficient to support the convictions for assault and intimidating a public servant. We also accept the State's concession that Toombs' right to a unanimous verdict was violated regarding the felony

harassment charge. Accordingly, we reverse those convictions and remand for resentencing. We otherwise affirm.

## FACTS

In May 2014, Andrew Toombs was participating in an electronic home monitoring (EHM) program with the City of Fife. Toombs had problems with the equipment that required ongoing help from the program manager, Filivaa Mageo. In mid-May, Toombs became agitated in a meeting with Mageo and hit him in the head with a closing door. Mageo did not report the incident to police and it was not investigated. Toombs continued to have difficulty with the EHM equipment. Mageo asked Toombs to come to the police department, where the EHM program is sited, on May 27, 2014 at 4:00 pm, to review the equipment. Toombs' mother drove him to the appointment, but they arrived late and Toombs found the door to the police station locked.

While Toombs was outside, Steven Van Zanten came out of the building. Van Zanten worked at the front desk of the police station and recognized Toombs as an EHM client. Toombs told Van Zanten that he needed to see Mageo. Van Zanten said he was off for the day, and that Toombs should use the buzzer by the front door to get into the station. From two or three feet away, Toombs threw down his gum, balled his hands into fists and held them "low at his sides." Verbatim Report of Proceedings (VRP) at 324. Toombs then placed one foot in front of the other, and said, "'I pledge allegiance to the flag of the United States of America. You need to get [Mageo] for me. We're going for a walk.'" VRP (09/14/15) at 322. Van Zanten declined to go with Toombs and instead

2

decided to remove himself from the situation for fear that he might be assaulted. He told Toombs he was going to get Mageo, then went inside the station and alerted Mageo. Meanwhile, Toombs got into his mother's car and they started to leave the parking lot.

When Mageo came out of the building, the car turned around and Toombs got out. He walked towards Mageo and stopped five or six feet away from him. Toombs looked angry, had his fists clenched, and was yelling, "I'm here." VRP (09/09/15) at 238. Mageo asked Toombs to calm down. By that time, five or six police officers came outside and encircled Toombs. Mageo stepped aside. Toombs started yelling profanities at the police officers. Toombs clenched and unclenched his fists, holding them around waist level. He placed one foot in front of the other, yelling "'[y]ou don't scare me'" and "'I'll kick your ass.'" VRP (09/16/15) at 379; 255; 552.

Toombs continued to yell and clench his fists after being instructed by police officers to calm down. The chief of police ordered him arrested for disorderly conduct. Officers tried to take Toombs into custody, but Toombs pulled his hands away. One officer attempted to place Toombs in a "cross-face" hold. VRP at 422. The hold was not successful, and the officer yelled that he'd been bitten. Another officer kneed Toombs two or three times. Still another officer tased Toombs four or five times to get him to the ground. Toombs kicked at police officers. He was finally handcuffed and taken into custody.

The trial court ordered a mental health evaluation due to doubts about Toombs' competency. The evaluator found that Toombs lacked the capacity to

assist in his defense. On August 6, 2014, the trial court ordered Toombs committed to Western State Hospital for restoration of competency. Western State Hospital did not admit Toombs until October 20, 2014. There, Toombs was restored to competency and the case proceeded to trial.

Toombs faced nine charges: two counts of intimidating a public servant, four counts of assault in the third degree, felony harassment, and resisting arrest. The jury convicted Toombs of one count of intimidating a public servant as to Van Zanten, felony harassment, resisting arrest, and two counts of third degree assault as to Van Zanten and Mageo for the May 27 incident. Toombs appeals.

## DISCUSSION

### Third Degree Assault Convictions

Toombs argues that insufficient evidence supports his convictions for third degree assault of Mageo and Van Zanten. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We draw all reasonable inferences from the evidence in the State's favor. Id. at 201. We defer to the trier of fact on issues of conflicting testimony, witnesses' credibility, and the persuasiveness of the evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004) (citing State v. Cord, 103 Wn.2d 361, 367, 693 P.2d 81 (1985)).

The jury was instructed that "[a] person commits the crime of Assault in the Third Degree when he assaults a law enforcement officer or other employee

of a law enforcement agency who was performing his official duties at the time of the assault." Clerk's Papers (CP) at 67. "Assault" is not defined by statute so courts use common law definitions. State v. Byrd, 125 Wn.2d 707, 712, 887 P.2d 396 (1995). Washington recognizes three common law definitions of assault: actual battery, attempted battery, and intentionally putting another in apprehension of harm. Id. at 712-13. The jury was instructed on all three definitions:

> An assault is an intentional touching or striking of another person that is harmful or offensive, regardless of whether any physical injury is done to the person. A touching or striking is offensive if the touching or striking would offend an ordinary person who is not unduly sensitive.
> An assault is also an act done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.
> An assault is also an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

CP at 81. (Emphasis added.)

Toombs contends that the evidence shows only that he assumed a fighting stance, clenched his fists and yelled at Mageo and Van Zanten. He points out there was no testimony that he moved toward either man or raised his fists as if to strike them. He argues that this evidence is insufficient to prove that he intended to create an apprehension and fear of bodily injury in Mageo or Van Zanten or that either man, in fact, had a reasonable apprehension and imminent fear of bodily injury.

5

The State, however, argues that the evidence is sufficient because Toombs assumed the "posture of someone who is about to engage in a physical fight" and "was in close enough physical proximity to inflict injury." Brief of Respondent at 14. The State also contends that both Mageo and Van Zanten testified that they thought they were "about to be physically hurt by the defendant."[1] Id.

We agree with Toombs. We are aware of no case, and none has been cited to us, where merely assuming an aggressive stance and yelling, at times nonsensical and at other times hostile statements, is sufficient to constitute an assault.

In State v. Godsey, 131 Wn. App. 278, 127 P.3d 11 (2006), the defendant faced a police officer with his fists up, invited him to "come on," and took a step toward the officer. The officer perceived that the defendant was charging him and kicked the defendant twice in the midsection to keep him at a distance. We held that under these facts, the defendant completed an assault by means of causing an apprehension of imminent bodily harm. Godsey 131 Wn. App. at 288.

In State v. Calvin, 176 Wn. App. 1, 316 P.3d 496 (2013), as amended, the defendant approached the open car window of a park ranger, agitated that the park was closed. The ranger exited the vehicle, suspecting that the defendant

---

[1] We note that the record does not support the claim that Mageo testified that he was fearful of being injured by Toombs. When asked whether he was afraid, Mageo answered, "I was kind of scared at the moment because I don't want, you know – you don't want anybody to get hurt." VRP (09/09/15) at 240. Toombs escalated his behavior after police surrounded him and Mageo stepped aside. Apprehension of harm in a third party is insufficient to meet the fear and apprehension element of common law assault. State v. Nicholson, 119 Wn. App. 855, 863, 84 P.3d 877 (2003) (overruled on other grounds by State v. Smith, 159 Wn.2d 778, 154 P.3d 873 (2007)).

was under the influence of intoxicants. From about five feet away, the ranger pointed his flashlight at the defendant, who put up his hand and reached towards the ranger. The ranger told the defendant to get back, but he did not. The ranger sprayed the defendant with pepper spray, but the defendant advanced. The ranger backed up about ten feet. The defendant continued advancing in an aggressive posture and the ranger struck him with a baton. We held that the ranger had a reasonable apprehension of harm because the incident occurred in an isolated area, the defendant was aggravated and under the influence, and the defendant reached toward the ranger, swore, and forced him to back up. Calvin, 176 Wn. App. at 501.

In both Godsey and Calvin, the defendant took an aggressive action by raising his fists or hands and moving toward the officer. In addition, in Calvin, the ranger was alone and in a dark, isolated area. In those cases, the defendant's acts and the surrounding circumstances were sufficient to show that the defendants intended to create and did create a reasonable fear of assault in the officers. But Toombs' encounters with Van Zanten and Mageo are distinguishable because it is undisputed that he neither raised his fists nor moved toward the men. And both incidents occurred in broad daylight and within the presence of police officers.

The State relies on Howell v. Winters, 58 Wash. 436, 108 P. 1077 (1910) to argue that the evidence in this case is sufficient to support the assault convictions, but Howell does not support the argument. In that case, Julia Howell visited a store owned by John Winters to return a corset purchased by her

7

No. 76018-1-I/8

husband and seeking a return of the purchase price. Howell alleged that Winters refused to either accept the item or refund the money and instead "used vile and opprobrious language towards her" and assaulted her. Id. at 437. Winters denied the allegations, but the jury found in Howell's favor.

Winters appealed arguing that the trial court's instruction to the jury defining assault was erroneous. The instruction read, in pertinent part, as follows:

> if you believe her testimony that he shook his fist in front of her
> face angrily and unlawfully, when he was in such proximity to her,
> as that he could or might have, struck her, also near enough to
> produce a feeling on her part that she might be struck, that would
> be an assault.

Id. In holding that the instruction was proper, the court described the types of conduct sufficient to meet the common law definition of assault.

> Such would be the raising of the hand in anger, with an apparent
> purpose to strike and sufficiently near to enable the purpose to be
> carried into effect; ... shaking a whip or the fist in a man's face in
> anger; riding or running after him in threatening and hostile manner
> with a club or other weapon; and the like.

Id. at 438, quoting 1 THOMAS M. COOLEY & JOHN LEWIS, A TREATISE ON THE LAW OF TORTS *278 at 494 (3d ed. 1906).

Neither the facts of Howell nor the examples cited therein are present in this case. There was no testimony that Toombs shook his fist in the face of Mageo or Van Zanten, or that he raised his hand in anger toward them or ran after them in a threatening or hostile manner or utilized any weapon or any other object. While we do not doubt that Toombs' confrontations with Mageo and Van Zanten were fraught with tension, we are constrained to hold, as a matter of law, that the conduct at issue here is insufficient for a rational fact finder to conclude

8

beyond a reasonable doubt that the crimes of assault were committed. The convictions are reversed.

Intimidating a Public Servant

Toombs also argues that the State failed to prove that he intimidated a public servant because his request that Van Zanten go get Mageo did not involve official action by Van Zanten. "A person commits the crime of Intimidating a Public Servant when, by use of a threat, he attempts to influence a public servant's decision or other official action as a public servant." CP at 65. There must be "evidence both that the defendant made a threat and that the threat was made with the purpose of influencing a public servant's official action." State v. Montano, 169 Wn.2d 872, 876, 239 P.3d 360 (2010). Official action "'simply means that the public servant is acting within the scope of what he or she is employed to do as distinguished from being engaged in a personal frolic.'" State v. Hendrickson, 177 Wn. App. 67, 77, 311 P.3d 41 (2013) rev. denied, 179 Wn.2d 1017, 318 P.3d 280 (2014) (quoting State v. O'Neill, 103 Wn.2d 853, 859, 700 P.2d 711 (1985)).

Toombs argues that based on the evidence presented at trial, no rational fact finder could find beyond a reasonable doubt that he attempted to influence a decision or other official action by Van Zanten when the two met outside the police station. He contends that because Van Zanten was off duty for the day when the two met, Van Zanten was not engaged in any decision-making or official business. But even if Van Zanten was on duty, Toombs contends that the evidence fails to establish that his conduct was an attempt to influence a decision

or other official action by Van Zanten. According to Toombs, he merely asked Van Zanten to go get Mageo for him, which required neither decision-making nor official action by Van Zanten.

The State contends Toombs' demand that Van Zanten get Mageo influenced official action because part of Van Zanten's job was to handle people that come to the front counter. The State also argues that Toombs influenced an official action by Van Zanten because Van Zanten was acting in his capacity as a public employee when he acceded to Toombs' demand to get Mageo from a building that was otherwise closed to the public.

We agree with Toombs that the evidence is insufficient to show that going to get Mageo was an official action by Van Zanten. Van Zanten testified that his primary duty at the front desk is "photo enforcement," i.e., reviewing traffic camera photos of red light violations and issuing citations. VRP (09/14/15) at 315-316. He also does "crime prevention" work in the community. Id. His job also includes "[h]andling people that come to the front counter as well as administrative duties, like taking in mail and stuff like that." Id. He did not testify that his job included going to get people upon request or providing afterhours access to the police station. But even if such a duty could be reasonably inferred, we do not agree that making such a request, even if accompanied by a threat, is the type of conduct encompassed by RCW 9A.76.180. As we observed in State v. Stephenson, 89 Wn. App. 794, 803-04, 950 P.2d 38 (1998):

> The plain language of RCW 9A.76.180 suggests several purposes. First, it protects public servants from threats of substantial harm based upon the discharge of their official duties. See State v. Hansen, 122 Wn.2d 712, 716-718, 862 P.2d 117 (1993)

10

> (legislative intent behind similar intimidating a judge statute, RCW 9A.72.160(1), is to "protect judges from retaliatory acts" because of past official actions). Second, it protects the public's interest in a fair and independent decision-making process consistent with the public interest and the law. And third, by deterring the intimidation and threats that lead to corrupt decision making, it helps maintain public confidence in democratic institutions. (Footnote omitted.)

Asking Van Zanten to go get Mageo is not the kind of demand that leads to corruption or an undermining of public confidence in our police officers. And, as discussed above, Toombs' conduct was hardly the sort that threatened Van Zanten with substantial harm or retaliation in connection with performing an official duty. Accordingly, we reverse Toombs' conviction for intimidating a public servant because the evidence presented in this case is insufficient to sustain it.

Felony Harassment

Toombs argues that his conviction for harassment violated his right to a unanimous verdict. He contends that the State introduced evidence of multiple acts to support a single charge of harassment, but failed to elect a single act to support the charge or provide a unanimity instruction to the jury. The State acknowledges the jury instruction error, and concedes that the error was not harmless. The concession is well taken. We reverse Toombs' conviction for felony harassment.[2]

Resisting Arrest

Toombs argues that the Fife disorderly conduct ordinance is unconstitutional, so the jury should not have been instructed that he could be

---

[2] Toombs argues that the judgment and sentence erroneously fails to classify the felony harassment, intimidating a public servant and assault in the third degree (Van Zanten) convictions as the same criminal conduct for purposes of Toombs' offender score. This issue is moot because we reverse each of these convictions.

convicted of resisting arrest for that crime. The State argues that Toombs failed to raise this issue below, and it is not a manifest constitutional error reviewable by this court.

Generally, we do not consider arguments raised for the first time on appeal. RAP 2.5(a). A defendant may appeal a manifest error affecting a constitutional right, however, even if the issue was not raised before the trial court. RAP 2.5(a)(3). The defendant must identify a constitutional error and show that it had practical and identifiable consequences in the proceeding. State v. Roberts, 142 Wn.2d 471, 500, 14 P.3d 713 (2000).

Toombs does not dispute that he failed to raise the issue below, nor does he argue that his claim constitutes a manifest constitutional error. Accordingly, we agree with the State and decline to consider the argument.

Delay in Competency Restoration Services

Toombs argues that his charges must be dismissed because the State violated his substantive due process rights by delaying his transfer to Western State Hospital for restoration services after he was found not competent to stand trial. The State argues that under these circumstances, dismissal of charges is not an inappropriate remedy for a substantive due process violation.

Constitutional challenges are questions of law subject to de novo review. Amunrud v. Bd. of Appeals, Dep't of Soc. and Health Servs., 158 Wn.2d 208, 215, 143 P.3d 571 (2006). An incompetent pretrial detainee cannot, after a competency hearing, be held indefinitely without either criminal process or civil commitment; due process requires, at a minimum, some rational relationship

between the nature and duration of commitment and its purpose. Jackson v. Indiana, 406 U.S. 715, 738, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972). In the context of civil lawsuits for long delays in evaluation and competency services, courts balancing the state interests against those of incapacitated criminal defendants found due process violations. Trueblood v. Wash. State Dep't of Soc. and Health Servs., 73 F.Supp.3d 1311, 1314 (W.D. Wash 2014) (incarcerating incompetent criminal defendants more than seven days while they wait for restoration services without a determination of good cause violates due process); Or. Advocacy Ctr. v. Mink, 322 F.3d 1101 (9th Cir. 2003) (incarcerating incompetent defendants in county jails for "weeks or months" constitute violations of substantive and procedural due process).

After the trial court ordered him committed to Western State Hospital, Toombs waited 75 days for admission. This long pre-trial detention is troubling. Nevertheless, even if Toombs can establish that the delay violates his due process rights, he offers no authority to show that dismissal of criminal charges is an appropriate remedy. We decline to vacate Toombs' remaining convictions on the basis of the alleged substantive due process violation.

Costs on Appeal

Toombs argues that the court should not impose appeal costs against him because he is indigent. Under our new RAP 14.2, we award costs to the substantially prevailing party on appeal unless the defendant is indigent. RCW 10.73.160(1); RAP 14.2. We give the defendant the benefits of a trial court's order of indigency throughout review unless a commissioner or clerk finds that

the defendant's financial situation has improved. Here, Toombs was found

indigent by the trial court. Under RAP 14.2, the State may request appeal costs

from the commissioner or clerk with evidence that Toombs' finances have

improved.[3]

Affirm in part and reverse in part.

WE CONCUR:

_Spearman, J._

_D. _____

_Becker, J._

---

[3] The sentencing court found Toombs indigent after conducting an individualized inquiry into his ability to pay legal financial obligations and indicated that it waived all discretionary fees and fines. The sentencing court also found that Toombs suffers from mental illness which, under RCW 9.94A.777, precludes imposition of costs other than restitution and the victim penalty assessment unless there is a finding of ability to pay. However, the judgment and sentence contains boilerplate language stating that "the defendant has the ability or likely future ability to pay the legal financial obligations imposed herein." CP at 107. The court also imposed a $100 DNA database fee, and a $200 filing fee. It is unclear from the record whether the sentencing court intended to impose these costs or whether this is a scrivener's error. The trial court may address this issue on remand.